UNITED STATES of America, Appellee/Cross–Appellant,

v.

Darnell L. MASON, Appellant/Cross–Appellee.

Nos. 90–3267, 91–3001.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 26, 1991.

Decided June 19, 1992.

Rehearing Denied Aug. 27, 1992.

---

William J. Garber (appointed by the Court), with whom Dennis M. Hart was on the brief, for appellant in No. 90–3267 and cross-appellee in No. 91–3001.

Robert De La Cruz, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Thomas C. Black and Jeffrey R. Ragsdale, Asst. U.S. Attys., were on the brief, for appellee in No. 90–3267 and cross-appellant in No. 91–3001.

Before WALD, SILBERMAN and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

Opinion concurring in part and dissenting in part from the rationale by Circuit Judge WALD.

KAREN LeCRAFT HENDERSON, Circuit Judge:

In this appeal, Darnell Mason challenges the district court's denial of his motion to suppress evidence seized during a search of his apartment. Cross-appellant United States challenges the district court's downward departure from the United States Sentencing Guidelines (guidelines) under 18 U.S.C. § 3553(b). We affirm the district court's denial of Mason's suppression motion but reverse the district court's departure from the guidelines and remand for resentencing.

## I.

### A. *The Suppression Motion*

According to the facts found by the district court, on the night of October 25, 1989, at approximately 9:15, appellant Darnell Mason returned with his girlfriend to his apartment located on the second floor of an apartment building at 3017 Naylor Road, S.E., Washington, D.C. As Mason reached to open the front door of the apartment, he noticed that the door was damaged. Two masked gunmen opened the door from the inside and demanded money

from him. Mason's girlfriend immediately fled; Mason tried to escape by running up the building's stairs. The gunmen shot at Mason, striking him in the lower leg. Although wounded, Mason was able to make his way to the third floor. There, the occupant of a third-floor apartment who had heard the shouting and the gunshots opened the door of his apartment, saw Mason and pulled him inside to safety. The neighbor then called 911 to request an ambulance, advising the dispatcher that shots had been fired.

At approximately 9:30 p.m., the police arrived at the neighbor's apartment where they found Mason. Mason gave them the details of the incident. On learning that the gunmen had come out of Mason's apartment and that the shooting had occurred in the corridor outside the apartment, the police proceeded to Mason's apartment to investigate. In the meantime, Mason was taken to Southeast Hospital.

When the police reached Mason's apartment, they noticed that the front door was ajar and heard noises from within. They entered the apartment and conducted a sweep of it to determine if the assailants or any additional victims were there. *Suppression Hearing Transcript* at 26–27 (Jan. 8, 1990). They did not find anyone in the apartment and determined that the source of the noise was either a radio or a television.

The police then secured the apartment and awaited the arrival of Officer Rupert Knowles, a crime scene investigator. Knowles arrived at approximately 9:45 p.m. and, after being briefed by the officers on the scene, asked whether they had obtained Mason's consent to search the apartment. They told him they had not and Knowles asked Detective Gatewood to go to the hospital to seek Mason's consent.

At approximately 10:45 p.m., Gatewood advised Knowles by radio that Mason had consented in writing to the search. Knowles then searched the apartment for any evidence identifying the gunmen.

During the search, Knowles discovered a plastic bag containing what he believed to be crack protruding from under a pillow on the top bunk of a bunk bed. Knowles also found a locked safe, 74 baggies containing a greenish substance and an ashtray containing traces of white powder and a single-edge razor blade. Knowles did not attempt to open the safe; instead he advised Gatewood that they needed a warrant or Mason's consent to open it. Because of what appeared to be a large quantity of illegal drugs, Gatewood requested the assistance of a vice officer. Vice Officer Charles Porter responded to the scene. When Porter arrived at the apartment, he saw Mason's sister, Jacqueline Tate, who had come to the apartment after hearing of her brother's injury. Later, at an unspecified time, Mason telephoned the apartment from the hospital and Tate answered; Porter asked to speak to Mason. Porter told Mason that the police had found a safe and wanted to open it. Porter advised Mason that the police could either obtain a warrant or Mason could give his consent. After the telephone conversation, Porter and Gatewood went to the hospital to seek Mason's consent and the key to the safe.

At approximately 11:00 p.m., Porter and Gatewood arrived at the hospital and found Mason, whose wound was still untreated, seated in a wheelchair at the registration counter.[1] Porter and Gatewood took Mason to another room where they showed him the consent form and explained it to him. Mason signed the form and gave them the key to the safe. Porter and Gatewood returned to the apartment. They opened the safe and found over $1000 in cash and several zip-lock bags containing a white rock substance which later tested positive for cocaine.

A grand jury subsequently indicted Mason for possession of more than fifty grams of crack with intent to distribute in violation of 21 U.S.C. § 841(a) and (b)(1)(A)(iii). Thereafter, Mason moved to suppress the evidence obtained during the search of the apartment. After several

---

1. The district court expressly found that Mason's wound was not "life-threatening." *Memo-* *randum Opinion on Motion to Suppress (Supp. Memo)* at 6.

days of testimony, the district court denied the motion. As to the police's initial entry of Mason's apartment, the district court, while recognizing the preference under the fourth amendment for a warrant authorizing the entry of a premises, held that the police "had ample justification for entering the apartment without a warrant" to conduct a "protective sweep" under the doctrine of "exigent circumstances." *Supp. Memo* at 8–9. The district court noted:

> The testimony elicited from both government and defense witnesses makes it clear that within minutes after arrival and hearing noises from within the apartment the officers entered the defendant's apartment with firearms drawn, quickly searched to see if any of the perpetrators were there, and promptly exited. According to all the testimony, the officers remained in the apartment for only five to ten minutes. Such an intrusion in light of the existing exigency does not constitute a Fourth Amendment violation.

*Supp. Memo* at 10.

The district court also rejected Mason's claims that his consent was invalid because 1) he was unable to understand the consent form due to his lack of education and 2) his "consent was not knowing and voluntary since he was in pain and had not been provided with medical attention until after both consent forms had been signed." *Id.* at 10. Regarding Mason's first contention, the district court concluded that Mason understood the form because, although he had only "a tenth grade education," he was "of better than average intelligence" and had "passed a written driver's license examination." *Id.* at 11.

Regarding Mason's second contention, the district court concluded that, while Mason "may have been in pain, it is clear that he was alert and capable of making the decisions he did." *Id.* According to the district court, Mason was coherent because at the time he was taken from the apartment house to the hospital, he "had the presence of mind to toss his keys to a

friend and ... make certain requests of her." *Id.* The district court also noted the telephone call Mason made to his apartment during which he talked with his sister and Officer Porter as further evidence of Mason's capacity to give a voluntary consent. *Id.* at 11–12. The district court denied Mason's motion to suppress, Mason entered a conditional guilty plea under Fed. R.Crim.P. 11(a)(2) and he now brings this appeal.

### B. The Sentencing

Under the guidelines, Mason's total offense level was 30 and his criminal history category was V. This combination results in a term of imprisonment ranging from 151 to 188 months. The district court, however, found that the "extraordinary" manner in which Mason was apprehended, i.e., Mason was a shooting victim and the shooting had "provided a certain amount of punishment to him," was a "circumstance ... not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." *Sentencing Memorandum (Sent. Memo)* at 2 (citing 18 U.S.C. § 3553(b)). The district court thus departed downward and sentenced Mason to a term of imprisonment of 120 months, the statutory minimum.[2] The government cross appeals the downward departure.

### II.

We begin with the district court's denial of Mason's motion to suppress. Mason argues that his rights under the fourth amendment were violated because 1) the initial warrantless entry into his apartment cannot be justified under the exigent circumstances exception to the warrant requirement, 2) the illegal initial entry tainted his subsequent consent according to *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and its progeny and 3) his consents to the search of his apartment and ultimately to the search of the safe were not knowing, vol-

---

**2.** The district court also sentenced Mason to five years' supervised release and ordered that he pay a $50 special assessment. *Sent. Memo* at 2–3.

untary and intelligent.[3] *Brief of Mason* at 29–30.

### A.

 We first address whether the initial entry by the police violated the fourth amendment. The Supreme Court has consistently held that a warrantless search of a residence does not violate the fourth amendment when exigent circumstances exist. *Mincey v. Arizona*, 437 U.S. 385, 393–94, 98 S.Ct. 2408, 2413–14, 57 L.Ed.2d 290 (1978); *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *Warden v. Hayden*, 387 U.S. 294, 298, 87 S.Ct. 1642, 1645, 18 L.Ed.2d 782 (1967); cf. *Ker v. California*, 374 U.S. 23, 41–42, 83 S.Ct. 1623, 1633–34, 10 L.Ed.2d 726 (1963). Among the exigent circumstances which excuse police compliance with the warrant requirement are pursuit of a suspect, *Hayden*, 387 U.S. at 298–99, 87 S.Ct. at 1645–46, and "[t]he need to protect or preserve life." *Mincey*, 437 U.S. at 392, 98 S.Ct. at 2413 (quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C.Cir. 1963)). So long as the police have a reasonable belief in the existence of the exigency and the subsequent search is no broader than necessary, the fourth amendment is not violated. *Mincey*, 437 U.S. at 392, 98 S.Ct. at 2413; *Hayden*, 387 U.S. at 299, 87 S.Ct. at 1646.

We think that the teachings of both *Mincey* and *Hayden* are applicable here. In *Mincey*, the Supreme Court noted that "when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises." 437 U.S. at 392, 98 S.Ct. at 2413. Similarly, in *Hayden*, the Supreme Court upheld a warrantless entry to search for a robbery suspect reported to have entered the premises shortly before the search. 387 U.S. at 298, 87 S.Ct. at 1645. The Court noted that the police:

acted reasonably when they entered the house and began to search for a man of the description they had been given and for weapons which he had used in the robbery or might use against them. The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape.

*Id.* at 298–99, 87 S.Ct. at 1646.

Here, the police had a reasonable belief in the existence of an exigency. The record demonstrates that they responded to a "911" report of a shooting. On their arrival at the scene, they interviewed Mason who had been shot in the leg. Mason told them that, as he opened the door to his apartment, two masked men attacked him from inside his apartment, demanded money from him and shot him as he attempted to flee. The area outside Mason's apartment was littered with shell casings and his apartment door bore signs of forced entry. The record further demonstrates that the police entered the apartment only after hearing noises that sounded like voices coming from inside. Moreover, only a short amount of time elapsed between the shooting and their entry into the apartment. The police did not know whether the gunmen had returned to the apartment, with their weapons, or left the premises. Nor did they know whether Mason was the only shooting victim. Not only was the search conducted in a "prompt" fashion,

---

3. Mason uses an incorrect standard to determine if a valid consent to search has occurred. The correct standard is whether consent is freely and voluntarily given. *See United States v. Mendenhall*, 446 U.S. 544, 557, 100 S.Ct. 1870, 1878, 64 L.Ed.2d 497 (1980); *Schneckloth v. Bustamonte*, 412 U.S. 218, 249, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973). Mason concedes that he understood what the police officers were

seeking, *Brief of Mason* at 29, and the district court so found. *Supp. Memo* at 11. That the police did not advise him of his right to refuse consent is only "a factor to be taken into account"; "the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." *Schneckloth*, 412 U.S. at 249, 93 S.Ct. at 2059.

*see Mincey,* 437 U.S. at 392, 98 S.Ct. at 2413, it was also limited in scope to a sweep of the apartment.[4] *Supp. Memo* at 3. It was thus far less intrusive than the "thorough search of the house for persons and weapons" upheld in *Hayden.*[5] 387 U.S. at 299, 87 S.Ct. at 1646. Given the circumstances the police confronted as well as the limited scope of the search, we cannot conclude that the search was unreasonable under the fourth amendment.[6]

### B.

■ We next consider whether Mason's consent was valid. The test to determine the legality of a consent is whether under the totality of the circumstances it was freely and voluntarily given. *Schneckloth v. Bustamonte,* 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973). Because the voluntariness of a consent is a question of fact, *id.* at 248, 93 S.Ct. at 2059, it is subject to the "clearly erroneous" standard of review. *United States v. Lewis,* 921 F.2d 1294, 1301 (D.C.Cir.1990); *see also United States v. Caballero,* 936 F.2d 1292, 1296 (D.C.Cir.1991). Our review of the record indicates that the district court's findings are not clearly erroneous.

Mason concedes that he understood the consent forms he signed but argues that, under the totality of the circumstances, his consent was not voluntary because: 1) the police implied that they would arrest his mother, 2) the "unsuccessful attempt by appellant to have his apartment locked before the police entered is contrary to the unequivocal nature that consent must possess to act as a valid waiver," 3) the police deceived him when they advised him (before obtaining his consent to the search of his safe) that he was not a suspect and 4) he had not received any medical treatment when he gave consent and "the bullet had splintered into five parts within his body." *Brief of Mason* at 30–31.

First, we reject Mason's contention that Officer Porter, during his telephone conversation with Mason, threatened to arrest Mason's mother. We note that Porter did not arrive on the scene until after the consensual search of the apartment which uncovered illegal drugs. Thus, even if Mason's allegation were true, the threat could not have influenced his first consent. Furthermore, not only did Porter deny making this threat but Mason's sister, who was present during the conversation, did not recount any such threat in her testimony. While the district court did not expressly find that the threat was not made, *see generally Supp. Memo* at 10–12, we conclude that the evidence, when viewed in the light most favorable to the government, indicates that it was not.

Second, we reject Mason's contention that his attempt to have his apartment locked is inconsistent with his subsequent consents. His apartment had already been broken into once and his attempt to secure it from further illegal acts was a natural reaction. Moreover, more than one hour elapsed between Mason's attempt to secure his apartment and Detective Gatewood's first trip to the hospital. Mason's conduct there, including his reading and signing of the consent forms for both the crime scene search and the search of the safe, manifests that his earlier action did not taint his consent.

We also reject Mason's assertion that he consented to the search of the safe because the police advised him that he was not a suspect. Mason's own recitation of the facts indicates that Detective Gatewood advised him that he was not a suspect only when seeking his consent for the crime scene search. *Brief of Mason* at 12. Because, as Mason concedes, *id.* at 27, evidence of his involvement in crime had not yet been discovered at that time, Mason

---

**4.** Mason concedes that during the sweep, the police uncovered no evidence of his criminal activity.

**5.** In *Hayden,* the police looked under a mattress and inside a toilet flush tank, washing machine and bureau drawer in their search for the robbery suspect and any weapons. 387 U.S. at 298, 87 S.Ct. at 1645.

**6.** Because we conclude that the initial entry did not violate the fourth amendment, we also reject Mason's *Wong Sun* claim.

was indeed not a suspect and the police did not deceive him in obtaining his consent.

Finally, we reject Mason's contention that his medical condition rendered his consent involuntary. The district court specifically found that "[a]lthough [Mason] may have been in pain ... he was alert and capable of making the decisions he did." *Supp. Memo* at 11. Given the coherency of Mason's conversations at the time he gave consent, this finding is not clearly erroneous. Accordingly, we affirm the district court's finding that Mason's consents were freely and voluntarily given and its denial of Mason's motion to suppress.

### III.

■ The government cross appeals the district court's downward departure from the guideline range of 151 to 188 months to the statutory minimum of ten years. The court based its decision on the unusual circumstances surrounding Mason's apprehension, specifically his having been shot by the gunmen outside his apartment. The government challenges both the reasonableness of the departure and the district court's failure to make supporting factual findings.

In enacting the Sentencing Reform Act of 1984, Congress intended, among other things, to eliminate unwarranted disparities in sentencing by circumscribing the traditional discretion accorded district courts. *See* 18 U.S.C. § 3553(a)(6); *see generally Mistretta v. United States*, 488 U.S. 361, 363–68, 109 S.Ct. 647, 649–52, 102 L.Ed.2d 714 (1989); S.Rep. No. 225, 98th Cong., 2d Sess. 38–39, 52 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3221–22, 3235 (S.Rep). A district court is to "treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes." U.S.S.G. ch. 1. pt. A(4)(b) (1991). The court may depart from the guideline range "only when it finds 'an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" 18 U.S.C. § 3553(b). Be-

cause the question the government raises is one of statutory interpretation, we review the district court's ruling *de novo. United States v. Ogbeide*, 911 F.2d 793, 795 (D.C.Cir.1990); *United States v. Burns*, 893 F.2d 1343, 1345 (D.C.Cir.1990), *rev'd on other grounds*, —— U.S. ——, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991).

We agree with the government that the departure was unauthorized. No matter how unusual the circumstances surrounding Mason's apprehension, we do not believe they constitute "mitigating" circumstances as required by 18 U.S.C. § 3553(b). Neither the Sentencing Reform Act nor its legislative history defines mitigating circumstance. *See generally* 18 U.S.C. §§ 3551 *et seq.;* S.Rep. at 37–191, *reprinted in* 1984 U.S.C.C.A.N. at 3182, 3220–3373. In addition our research indicates that no court has defined the term as used in 18 U.S.C. § 3353(b). Nevertheless, we note first the traditional purposes underlying the imposition of criminal sanctions as codified in 18 U.S.C. § 3553(a), to wit: retribution, *see* 18 U.S.C. § 3553(a)(2)(A); deterrence, *see* 18 U.S.C. § 3553(a)(2)(B); incapacitation, *see* 18 U.S.C. § 3553(a)(2)(C); and rehabilitation. *See* 18 U.S.C. § 3553(a)(2)(D). In addition, general legal commentary provides some insight into the term's meaning.

According to one commentator:

The special features of Mitigation are that a good reason for administering a less severe penalty is made out if the situation or mental state of the convicted criminal is such that he was exposed to an unusual or specially great temptation, or his ability to control his actions is thought to have been impaired or weakened otherwise than by his own action, so that conformity to the law which he has broken was a matter of special difficulty for him as compared with normal persons normally placed.

H.L.A. Hart, *Prolegomenon to the Principles of Punishment, in Punishment and Responsibility* 1, 15 (1968). The emphases on a defendant's mental state or situation as well as his ability to control his actions suggest that a defendant is not entitled to

mitigation unless the circumstances of his crime make him less morally blameworthy.

Similarly, another commentator observed:

> Just what is a mitigating or an aggravating factor: how are these terms defined? Mitigation, as opposed to the legal defenses of justification or excuse, presupposes that someone is convicted of violating a criminal law and is therefore liable to be punished. *A mitigating circumstance* may be considered as one that extenuates or *reduces the degree of moral culpability.*

Jack M. Kress, *Prescription for Justice: The Theory and Practice of Sentencing Guidelines* 183 (1980) (emphasis added); *see also Black's Law Dictionary* 1002 (6th ed. 1990) (defining "mitigating circumstances" as "[s]uch as do not constitute a justification or excuse for the offense in question, but which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability").

According to these sources, a mitigating circumstance is linked only to the retributive purpose of the criminal sanction. A circumstance is a mitigating one if it demonstrates that the defendant is less morally blameworthy for his crime than he otherwise would be if the circumstance did not exist. Because of his lessened degree of moral blameworthiness, he is less deserving of society's reprobation. Thus, it is only just that his sentence be reduced.

Other authority suggests that mitigating circumstances should not be linked just to the retributive purpose but also to the other recognized purposes of criminal sanctions. In this view, a circumstance mitigates if it demonstrates a reduced need to punish the defendant. For example, in adopting section 7.01 of the Model Penal Code (MPC), the American Law Institute included "Criteria for Withholding Sentence of Imprisonment and for Placing Defendant on Probation." These criteria include, among others, whether "the defendant's criminal conduct was the result of circumstances unlikely to recur"; whether "the character and attitudes of the defendant indicate that he is unlikely to commit another crime"; and whether "the defendant is particularly likely to respond affirmatively to probationary treatment." MPC § 7.01(2)(h)–(j). The same or similar provisions have been adopted by several states. *See, e.g.,* Ark.Stat.Ann. § 5–4–301(b) (1991) (adopting MPC provisions); Idaho Code § 19–2521(1) (1991) (sentencing court should not imprison defendant unless necessary because of risk "defendant will commit another crime," "correctional treatment" will "be provided most effectively by ... commitment to an institution" or imprisonment necessary to deter defendant or others); Ind.Code Ann. § 35–38–1–7.1(c) (1990) (sentencing court may reduce sentence if defendant "unlikely to commit another offense" or "particularly likely to respond affirmatively to probationary treatment"); N.J.Stat. § 2C:44–1(B) (1990) (same). These factors relate not to the retributive purpose but to the incapacitative, rehabilitative and deterrent purposes of the criminal sanction.

Similarly, the Supreme Court's death penalty jurisprudence requires that the sentencing authority be allowed to consider "*as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978) (emphasis in original). Among other circumstances, the Court has held that a capital defendant may introduce, as a mitigating circumstance, evidence of his good behavior and "peaceful adjustment to life in prison" during the period between apprehension and trial. *Skipper v. South Carolina,* 476 U.S. 1, 7, 106 S.Ct. 1669, 1672, 90 L.Ed.2d 1 (1986). Such evidence is related, if at all, to the incapacitative purpose of the criminal sanction because it provides evidence of a defendant's "probable future conduct." *See id.* at 5, 106 S.Ct. at 1671.

Whether Congress intended to define a mitigating circumstance narrowly as one that reduces a defendant's moral culpability or more broadly to include all relevant circumstances indicating a reduced need to

punish,[7] we are convinced that the manner of Mason's apprehension is not a mitigating circumstance. Indeed, it is irrelevant to the departure decision. While Mason's misfortune may make him an object of sympathy, it does not make him less culpable for the crime of possession of crack cocaine with intent to distribute. *See Dukes,* 936 F.2d at 1283; *Alvarez–Cardenas,* 902 F.2d at 737; *see also* 18 U.S.C. § 3553(a)(2)(A) (instructing sentencing court to consider need "to reflect the seriousness of the offense"). Nor does the shooting authorize a downward departure in order to provide just punishment. *See* 18 U.S.C. § 3553(a)(2)(A) (instructing sentencing court to consider need "to provide just punishment for the offense"). No representative of the government acting for society shot Mason. The shooting was not *punishment* and we decline to recognize as a mitigating circumstance one that could allow society's interest in punishing offenders to be affected by the random acts of criminals.

The fact that Mason was shot by armed intruders is likewise irrelevant to the other recognized objectives of the criminal sanction. There is no demonstrable correlation between Mason's having been shot and any increase in the likelihood that he will not commit crimes in the future and instead become a law abiding citizen. *See* 18 U.S.C. § 3553(a)(2)(C) (instructing sentencing court to consider need "to protect the public from further crimes of the defendant"). Nor has Mason demonstrated the "rare" and "extraordinary" type of rehabilitation that, as we have recently recognized, may warrant a departure. *See United States v. Harrington,* 947 F.2d 956, 962 (D.C.Cir.1991). To the contrary, reducing Mason's sentence will only decrease the time available to the corrections system in

---

7. In reviewing downward departures as well as denials of departures, appellate courts have by implication endorsed both views. For example, in *United States v. Dukes,* 936 F.2d 1281 (D.C.Cir.1991), we rejected the argument that a plea bargain is a mitigating circumstance under 18 U.S.C. § 3553(b). We noted that "[a]side from 'acceptance of responsibility,' [which has been taken into account by the Commission] a plea bargain discloses nothing about the defendant's character or condition and it does not add to or detract from the seriousness of the offense." 936 F.2d at 1283. We thus took the view that a circumstance does not mitigate unless it reduces the defendant's moral blameworthiness. Similarly, in *United States v. Alvarez–Cardenas,* 902 F.2d 734 (9th Cir.1990), the Ninth Circuit affirmed a district court's refusal to depart downward on the ground that the defendant was an alien who was subject to deportation. 902 F.2d at 737. The court noted that "[a] defendant's crime is no less serious, nor is his history of past actions changed because he may be subjected to deportation proceedings at some point in the future." *Id.; see also United States v. Pozzy,* 902 F.2d 133, 139 (1st Cir.) (reversing downward departure based on claim that defendant was being punished by spouse's imprisonment), *cert. denied,* —— U.S. ——, 111 S.Ct. 353, 112 L.Ed.2d 316 (1990); *United States v. Parker,* 912 F.2d 156, 158 (6th Cir.1990) (reversing downward departure based on alleged need to equalize sentence with co-defendant's); *United States v. Brewer,* 899 F.2d 503, 509–10 (6th Cir.) (reversing downward departure based on district court's finding that incarceration would serve no useful purpose), *cert. denied,* —— U.S. ——, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990).

In *United States v. Lara,* 905 F.2d 599 (2d Cir.1990), the Second Circuit affirmed a downward departure because of the defendant's "potential for victimization" after jail officials had already placed him in solitary confinement to protect him. *Id.* at 601. While this circumstance did not reduce the defendant's moral culpability, it was linked to the retributive purpose of the criminal sanction in that the additional punishment of solitary confinement offset the reduction in his sentence. *Id.* at 604. The Second Circuit also rejected the government's contention that the "consideration of the potential for victimization reflects a rehabilitative model of sentencing rejected by Congress." *Id.* The Second Circuit noted that to the extent the district court's departure reflected a rehabilitative aim, "rehabilitation has not been entirely eliminated from the sentencing process." ' *Id.; see also United States v. Deane,* 914 F.2d 11, 14 (1st Cir.1990) (reversing downward departure based on Bureau of Prisons' failure to offer "meaningful counselling program" but suggesting such departure may be authorized when "defendant has an exceptional need for, or ability to respond to, treatment"); *United States v. Maddalena,* 893 F.2d 815, 818 (6th Cir.1989) (remanding because district court did not believe it could depart on basis of defendant's efforts to stay away from drugs); *United States v. Harrington,* 947 F.2d 956, 962 (D.C.Cir.1991) ("leav[ing] open the possibility that, 'on rare occasion,' a [departure] might be in order, 'but only when and if the rehabilitation is 'so extraordinary as to suggest its presence to a degree not adequately taken into consideration by the [guidelines]' ' ").

its efforts to rehabilitate him. *See* 18 U.S.C. § 3553(a)(2)(D) (instructing sentencing court to consider need "to provide ... defendant with needed educational or vocational training ... or other correctional treatment"). Finally, reducing Mason's sentence based on the shooting will not deter *others* from engaging in criminal activity. *See* 18 U.S.C. § 3553(a)(2)(B) (instructing sentencing court to consider need "to afford adequate deterrence to criminal conduct").

We are convinced that the manner of Mason's apprehension is not a mitigating circumstance under 18 U.S.C. § 3553(b) and therefore the departure is unauthorized. Moreover, that the Commission itself has similarly interpreted the statute—implicitly rejecting [8] manner of apprehension (at least for a defendant in Mason's circumstances) as a mitigating circumstance—is apparent from at least two guideline provisions: (1) U.S.S.G. § 3E1.1, governing acceptance of responsibility and (2) U.S.S.G. § 3C1.1, governing obstruction of justice.

The guideline provision for acceptance of responsibility, U.S.S.G. § 3E1.1, provides for a two-level reduction in the offense level for a qualifying defendant. U.S.S.G. § 3E1.1. Of note, the Commentary to section 3E1.1 lists as "appropriate considerations" in making this determination a defendant's "voluntary termination or withdrawal from criminal conduct or associa-

tions" as well as a defendant's "voluntary surrender to authorities promptly after commission of the offense." The Commission, by providing for a reduced sentence for a defendant who accepts responsibility for his crime, has determined that a defendant's "voluntary termination" and "voluntary surrender" are relevant factors. In doing so, the Commission at least by implication rejected Mason's circumstance as an "appropriate consideration[ ]," concluding that a defendant who is apprehended, not by his voluntary act, but by the acts of third parties or the police is not entitled to the reduction.[9] Mason's repeated criminal activity [10] was, if anything, cut short by circumstances not of his making nor manifesting his volition.

Similarly, in prescribing a two level increase in the offense level for "willfully obstruct[ing] or imped[ing] ... the administration of justice during the investigation ... of the instant offense," the Commission manifested its rejection of Mason's circumstances as justifying a two level increase. *See* U.S.S.G. § 3C1.1. While the Commission determined that a defendant who "willfully obstruct[s]" criminal investigations should be punished more severely, in doing so, it rejected by implication an enhanced offense level for a defendant who does not willfully obstruct the investigation of his crime but merely continues his criminal activity until his apprehension.[11] In

8. Our colleague's separate opinion misunderstands our opinion. We do not contemplate the prospect that the Commission might have "considered" the circumstance of Mason's apprehension as a mitigating circumstance. Indeed, it could not have done so in view of our conclusion that the *statute* does not allow the manner of Mason's apprehension to be treated as a mitigating circumstance. Instead, we use the Commission's deliberations, as reflected in the guidelines, as added support for our statutory construction.

9. If Mason had voluntarily terminated his criminal conduct or voluntarily surrendered and received the two point reduction, the guideline range would have been 130–162 months, a sentence which at its low end is ten months longer than the sentence Mason received.

10. Mason had a criminal history category of V. *Presentence Report* at 5.

11. We note that the Commission recently added § 5K2.16 (Policy Statement) entitled "Voluntary Disclosure of Offense." It provides:

If the defendant voluntarily discloses to authorities the existence of, and accepts responsibility for, the offense prior to the discovery of such offense, and if such offense was unlikely to have been discovered otherwise, a departure below the applicable. guideline range for the offense may be warranted. For example, a downward departure under this section might be considered where a defendant, motivated by remorse, discloses an offense that otherwise would have remained undiscovered. This provision does not apply where the motivating factor is the defendant's knowledge that discovery of the offense is likely or imminent, or where the defendant's disclosure occurs in connection with the investigation or prosecution of the defendant for related conduct.

While this provision was not in effect at the time of Mason's offense, it supports our conclu-

short, the Commission rejected the manner of Mason's apprehension as a ground either to reduce his sentence or to increase his sentence.

Moreover, to the extent the district court may have meant, in describing the shooting as "punishment," to base its downward departure on manner of apprehension solely on account of the physical impairment Mason may have experienced from the gunshot wound, we note that section 5H1.4 declares: "Physical condition ... is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.4 (Policy Statement). The Commission then stated: "However, an *extraordinary* physical impairment may be a reason to impose a sentence below the applicable guideline range." *Id.* (emphasis added). There is no evidence that Mason's wound was extraordinary; in fact, Mason concedes that he fully recovered from the wound. In addition, section 5K1.1(a)(4) instructs the district court, in determining the "appropriate reduction" based on a defendant's "substantial assistance to authorities," to consider "any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance." U.S.S.G. § 5K1.1(a)(4). This is another indication that the Commission considered injury to the defendant relevant in some circumstances but, by negative implication, not in Mason's.

■ Mason is treated neither better nor worse as a result of the circumstances of his apprehension. Instead, the Commission chose to treat him as it would any other "typical" drug dealer with a criminal history category of V—by prescribing that he be sentenced to a prison term of 151–188 months. It is not the district judge's role to "mold typical criminal conduct or defendant characteristics into atypicality merely to achieve a departure from the guide-

lines." *United States v. Studley*, 907 F.2d 254, 257 (1st Cir.1990); *accord United States v. Williams*, 891 F.2d 962, 967 (1st Cir.1989) (Judges are not to "flyspeck individual cases to find some sort of idiosyncracy.... If the guidelines are to provide a coherent system of criminal sentencing, the trial court's right to depart, up or down, must be restricted to those few instances where some substantial atypicality can be demonstrated."). There is nothing about Mason's criminal conduct that makes him atypical. The district court's departure here serves only to "frustrate the Congressional goal of uniformity" embodied in the guidelines. *Studley*, 907 F.2d at 257. Accordingly, we vacate Mason's sentence and remand the case for resentencing in accordance with this opinion.[12]

### IV.

We reject Mason's fourth amendment challenge and affirm his conviction. Because we conclude that the district court erred, however, in departing downward based on the manner in which Mason was apprehended, we vacate Mason's sentence and remand for resentencing.

*So ordered.*

WALD, Circuit Judge, concurring in part and dissenting in part from the rationale:

I agree with my colleagues that the district court properly denied Mason's motion to suppress. I also agree that Mason's gunshot wound is not a "mitigating circumstance" within the meaning of 18 U.S.C. § 3553(b) and that it cannot, therefore, serve to justify a downward departure from the guidelines range, because it is not related to any of the stated purposes of sentencing, *i.e.*, just punishment, adequate deterrence, public protection, or rehabilitation. 18 U.S.C. § 3553(a)(2) (1988). But I am distinctly uncomfortable with pro-

---

sion that the manner of Mason's apprehension is not a mitigating circumstance.

**12.** Our holding that Mason's injury is not a mitigating circumstance warranting a departure would not prevent the district court from considering this factor, if it chooses, in sentencing Mason at the low end of the guideline range of

151–188 months. *See* U.S.S.G. ch. 5. pt. H (Introductory Commentary) ("Unless expressly stated, this does not mean that the Commission views such factors as necessarily inappropriate to the determination of the sentence *within* the applicable guideline range.") (emphais added).

nouncements in the panel opinion that I do not believe are necessary to the holding and which I fear may give misleading signals to future panels.

The Sentencing Commission has recognized the continued importance of judicial discretion in sentencing. "When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." *Guidelines Manual* app. C, at 132. After listing a few factors that a court cannot take into account as grounds for departure—race, sex, national origin, creed, religion, socio-economic status, drug or alcohol dependency, and economic hardship—the Commission indicated that "[w]ith those specific exceptions, ... [it] does not intend to limit the kinds of factors (*whether or not mentioned anywhere else in the guidelines* ) that could constitute grounds for departure in an unusual case." *Id.* (emphasis added).

Yet, after concluding that Mason's gunshot wound was not a "mitigating circumstance" under the Sentencing Reform Act, my colleagues indulge in what I consider mischievous speculation that the Commission has by implication already considered and rejected a defendant's "manner of apprehension" as a ground for departure when it provided for a two-level reduction for a defendant who voluntarily surrenders to authorities. *See* Majority Opinion ("Maj. Op.") at 1497 ("at least by implication [the Commission] rejected Mason's circumstance as an 'appropriate consideration[ ],' concluding that a defendant who is apprehended, not by his voluntary act, but by the acts of third parties or the police is not entitled to the reduction"). I believe such reasoning is fallacious. The statute instructs a district judge who finds a circumstance to be "mitigating" to then consider whether it is "of a kind, or to a degree, not *adequately* taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b) (1988) (emphasis added).

Review is not limited to determining whether the Commission merely "considered"—i.e., mentioned—a subject.

Rather, the test [in 18 U.S.C. § 3553(b) ] focuses on the *adequacy* of the consideration. It holds the Commission accountable with respect to the *quality* of the guideline and assures courts that they need not follow ill-considered limitations on their discretion.

Daniel J. Freed, *Federal Sentencing in the Wake of Guidelines: Unacceptable Limits on the Discretion of Sentencers,* 101 YALE L.J. 1681, 1699 (1992) (emphasis in original). The mere *failure* to discuss a factor as grounds for an *adjustment* does not constitute "adequate" consideration of that factor so as to preclude its use as a ground for departure. There is no authority whatsoever for the contrary proposition or for what my colleagues call consideration by "negative implication," Maj.Op. at 1498. I find it farfetched at best to infer that because the Commission only discussed "voluntary surrender" as justifying an adjustment for acceptance of responsibility, no other circumstance of apprehension—for example, apprehension while rescuing an innocent bystander—would ever justify a departure. By suggesting that the Commission, by mentioning some, had ruled out all other aspects of apprehension as mitigating grounds for departure, my colleagues have improperly foreclosed the case-specific determination of sentence that the Sentencing Reform Act clearly contemplated. *See* Freed, *supra,* at 1708.

My colleagues insist that their negative interpretation of the Commission's silence is intended only as support for the argument that Mason's circumstances could not be considered "mitigating" within the meaning of the statute. *See* Maj.Op. at 1497 n. 8. What disturbs me, however, is the fact that they rely at all on the Commission's *lack* of consideration of case-specific factors as a guide in limiting the discretion of district judges to depart. I find that course to be entirely at odds with the statute's clear direction that only when the sentencing court believes the Commission's consideration of the factor to have been "adequate" will the court be precluded from using that factor as a grounds for departure. Although the majority's rea-

soning may not affect the result in this case, it could well do so in future cases.

In the rapidly evolving jurisprudence of the Sentencing Guidelines, I believe an appellate court should be consciously modest in foreclosing trial court discretion in situations other than the precise one before it. For that reason, I disassociate myself from the majority's suggestion that a "negative implication" arises whenever the Commission fails to mention the precise unusual circumstances that a court cites as grounds for departure.