Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 20, 2003        Decided April 30, 2004

No. 02-3094

UNITED STATES OF AMERICA,
APPELLEE

v.

MALACHI GOREE,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 01cr00319–01)

*A. J. Kramer*, Federal Public Defender, argued the cause for appellant. With him on the briefs was *Sean C. Grimsley*, Assistant Federal Public Defender.

*Valinda Jones*, Assistant U.S. Attorney, argued the cause for appellee. On the brief were *Roscoe C. Howard, Jr.*, U.S. Attorney, *John R. Fisher*, *Kathleen M. Konopka*, and *Roy W. McLeese III*, Assistant U.S. Attorneys.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before: EDWARDS and GARLAND, *Circuit Judges,* and
WILLIAMS, *Senior Circuit Judge.*

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: Malachi Goree pled guilty to
unlawful possession of a firearm and ammunition by a convict-
ed felon in violation of 18 U.S.C. § 922(g), but reserved his
right to appeal the denial of his motion to suppress incrimina-
ting evidence and statements. Because we do not have a
sufficient factual record upon which to assess the constitution-
ality of the search that produced this evidence, we remand for
further proceedings.

I

In the late morning of June 22, 2001, Metropolitan Police
Department Officers Maradiaga and Moon received a radio
dispatch reporting a domestic assault in progress at Apart-
ment 204, 2540 Elvans Road, in Southeast Washington, D.C.
The officers arrived on the scene within minutes and knocked
loudly on the door of the apartment. There was no response.
They then radioed their dispatcher, who advised that a repre-
sentative of the building's management company would meet
them with a spare key. When the representative arrived, he
used a two-way radio to call the eyewitness to the assault,
another employee of the management company. As Officer
Maradiaga listened, the employee explained that he had seen
a man accost a woman and drag her by her hair into
Apartment 204.

The officers opened the apartment door with the spare key
and announced themselves as police. The apartment was
dark: drapes covered the windows, and only a dim light was
on in the dining room area. Peering inside, the officers saw a
man and woman — later identified as defendant Goree and
his then-girlfriend (and the apartment's leaseholder) Kenzie
Lemons — walking toward them from a rear room. Officer
Maradiaga ordered the defendant to stop moving and to put
his hands in the air. Goree did not comply; instead, he
continued to come toward the officers. Maradiaga then en-

tered the apartment, grabbed Goree's hands, and handcuffed him.

As discussed below, the testimony at the suppression hearing concerning the apartment's layout lacks significant details. It does establish, however, that the apartment was small, and that it consisted of one bedroom off a main hallway, a combined living room-dining room area, and a kitchen adjacent to the dining room area. The sequence of events following Goree's handcuffing is also unclear, but at some point soon thereafter, the police made a brief visual sweep of the apartment to ensure that no other individuals were present.

Officer Maradiaga then asked Goree to sit at the dining room table. Goree physically and verbally resisted, insisting that he wanted to sit on the living room couch instead. But because the couch was covered with boxes, Maradiaga proceeded to walk Goree into the dining area, where the officer saw a loaded, semiautomatic gun magazine (an ammunition clip) in plain sight on the dining room table.

Concerned that the presence of the magazine indicated the presence of a weapon, Maradiaga asked Lemons and Goree whether there was a gun in the house. Goree did not respond; Lemons said there was no gun. Maradiaga, however, was not persuaded. He testified that he had had considerable experience investigating domestic-violence incidents, and that in his experience, "whoever is the complainant at the time, will not be responsive to the police and will usually lie to cover for the other partner." App. 195–96. He therefore asked Lemons for permission to search for a weapon. Although Maradiaga testified that she responded, "Fine. Go ahead," the district court later concluded that it was "not persuaded . . . that what she gave was consent." *Id.* at 178. Maradiaga testified that Officer Moon then walked into the kitchen, where he saw a semiautomatic pistol lying on top of the refrigerator. At some point during the course of this search, two police sergeants also arrived on the scene.

After discovering the gun, the officers formally placed Goree under arrest and drove him to the police station.

There he was read his *Miranda* rights and questioned about the gun and ammunition. At the conclusion of the interview, Goree signed a document stating that he was "holding" the gun for a man called "L.B.," and that L.B. "put the clip on top of . . . the kitchen table." *Id.* at 2–4.[1]

Goree moved to suppress both the gun and the statements as fruits of an unlawful, warrantless search. Although the district court rejected the government's contention that the officers had obtained valid consent to search the kitchen, it nonetheless denied the motion to suppress, relying primarily on the "exigent circumstances" exception to the Fourth Amendment's warrant requirement.[2] After losing the motion

_____

[1] Lemons was also questioned by the officers immediately after the gun was found and later signed a written statement. The parties agree that her statement plays no part in this appeal.

[2] The district court also relied on the "inevitable discovery" doctrine, under which unlawfully obtained evidence is admissible if it "ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984); *see also United States v. Gale*, 952 F.2d 1412 (D.C. Cir. 1992). The government based its inevitability claim on the testimony of Officer Maradiaga and Sergeant Caldwell, each of whom testified that, but for Maradiaga's mistake about consent, he would have stopped the search and sought a warrant. We are dubious that such conjectural testimony is adequate to support applying the doctrine to this case. *See Nix*, 467 U.S. at 444 n.5 (holding that "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment"). Moreover, while the circuits disagree over the scope of the doctrine, neither this nor any other circuit has yet extended it as far as would be required to justify the gun's seizure here. *See, e.g.*, *Gale*, 952 F.2d at 1415 (holding that drugs seized from defendant's person and automobile trunk, based on statements taken without *Miranda* warnings, would inevitably have been discovered in a search incident to arrest and a post-impound inventory search); *United States v. Dice*, 200 F.3d 978, 986 (6th Cir. 2000) (holding that the government must "proffer clear evidence of an independent, untainted investigation that inevitably would have uncovered the same evidence as that discovered through the illegal search") (internal quotation marks omitted); *United States v. Allen*, 159 F.3d 832, 839–40 (4th Cir.

to suppress, Goree entered a conditional plea of guilty pursuant to Federal Rule of Criminal Procedure 11(a)(2), reserving his right to take this appeal.

## II

Under the Fourth Amendment, a "search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions." *Illinois v. Rodriguez*, 497 U.S. 177, 191 (1990) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 474 (1971)). One such exception is for "exigent circumstances," and the "Supreme Court has consistently held that a warrantless search of a residence does not violate the fourth amendment when exigent circumstances exist." *United States v. Mason*, 966 F.2d 1488, 1492 (D.C. Cir. 1992) (citing, inter alia, *Mincey v. Arizona*, 437 U.S. 385, 393–94 (1978), and *Warden v. Hayden*, 387 U.S. 294, 298 (1967)). "The police," however, "bear a heavy burden in attempting to demonstrate an urgent need that might justify

1998) (holding that inevitability was not established by an officer's testimony that, if she had not mistakenly thought that the defendant's bag had been abandoned, she would have used her narcotics dog to sniff the bag and establish probable cause for a warrant). *Compare United States v. Silvestri*, 787 F.2d 736, 745–46 (1st Cir. 1986) (concluding that, although "[i]n cases where a warrant is obtained . . . the active pursuit requirement is too rigid," a requirement that the police were actively pursuing an alternative lawful means of obtaining the evidence may "be appropriate in illegal search cases where no warrant is ever obtained"), *with United States v. Cherry*, 759 F.2d 1196, 1206 (5th Cir. 1985) (holding that the prosecution normally must show "that the government was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation" for the inevitable discovery exception to apply). Because application of the exigent circumstances exception should be straightforward once the factual discrepancies discussed below are resolved, we defer a ruling on the more novel inevitable discovery claim unless and until it becomes necessary to resolve this case.

warrantless searches." *Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984).

Although the Supreme Court has never provided a complete catalog of the exigencies that satisfy the exception, *see United States v. Dawkins*, 17 F.3d 399, 405 (D.C. Cir. 1994), it has recognized that "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Mincey*, 437 U.S. at 392 (internal citation and quotation marks omitted). As the Court said in *Warden v. Hayden*, the "Fourth Amendment does not require police officers to delay in the course of an investigation" in order to obtain a warrant, "if to do so would gravely endanger their lives or the lives of others." 387 U.S. at 298–99.[3] The "question of whether there were 'exigent circumstances' is judged according to the totality of the circumstances," and the standard "is an objective one, focusing on what a reasonable, experienced police officer would believe." *In re Sealed Case*, 153 F.3d 759, 766 (D.C. Cir. 1998) (internal quotation marks and citations omitted); *see United States v. Socey*, 846 F.2d 1439, 1446–47 (D.C. Cir. 1988).

Finally, in addition to the requirement that "the police have a reasonable belief in the existence of the exigency," the subsequent search must be "no broader than necessary." *Mason*, 966 F.2d at 1492. Courts adjudicating the lawfulness of a search under this exception weigh the degree of intrusion against the exigency that is its rationale. *See Socey*, 846 F.2d at 1448; *United States v. Lopez*, 989 F.2d 24 (1st Cir. 1993). As the Court said in *Mincey*, "a warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation.'" *Mincey*, 437 U.S. at 393 (quoting *Terry v. Ohio*, 392 U.S. 1, 26 (1968)).

---

[3] *See Minnesota v. Olson*, 495 U.S. 91, 100 (1990) (noting that "a warrantless intrusion may be justified by … the risk of danger to the police or to other persons") (citations omitted); *In re Sealed Case*, 153 F.3d 759, 765–66 (D.C. Cir. 1998); *Dorman v. United States*, 435 F.2d 385 (D.C. Cir. 1970) (en banc).

We review de novo the district court's legal conclusion that a warrantless search was justified by the exigent circumstances exception, *Sealed Case*, 153 F.3d at 764, but review its "findings of historical fact only for clear error and . . . give due weight to inferences drawn from those facts," *Ornelas v. United States*, 517 U.S. 690, 699 (1996). In Part III we address the legal issues posed by the search of the kitchen in this case. In Part IV we address the factual uncertainties that occasion a remand.

### III

Goree maintains a single challenge on this appeal. He concedes that "exigent circumstances justified the initial warrantless entry of the apartment and subsequent seizure of the gun magazine clip" in the dining room area. Appellant's Br. at 17. And he does not dispute that the officers' first look into the adjoining rooms — including the kitchen — was justified as a "protective sweep" for dangerous persons under *Maryland v. Buie*, 494 U.S. 325 (1990). *See id.* at 334 ("[A]s an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other places immediately adjoining the place of arrest from which an attack could be launched.").[4] Goree argues only that the seizure of the gun was the product of a second warrantless search of the kitchen, unjustified by exigent circumstances. To explore the validity of this claim, we first address it in light of the government's view of the facts.

The officers were called to the scene by a radio report of a "code one," indicating that a violent crime — in this case, a domestic assault — was in progress. Officer Maradiaga testified that, in his experience, domestic disturbances are unpredictable and dangerous, both to the participants and to the investigating officers. App. 195–97; *see Tierney v. Davidson*, 133 F.3d 189, 197 (2d Cir. 1998) (noting "the

---

[4] The government, for its part, forswears reliance on *Buie* as justification for the search that actually resulted in discovery of the gun. Appellee's Br. at 12 n.3.

combustible nature of domestic disputes").[5] The 911 call that prompted the dispatch was confirmed by a second contact when the police arrived on the scene: a building employee reported having seen a man drag a woman into the apartment by her hair. The officers' concern was heightened when the apartment's occupants failed to respond to their knock at the door. When the officers opened the door, they found the apartment poorly lit. Their apprehension was heightened still further by Goree's defiance of their initial order to stop approaching them, and by his resistance to their efforts to seat him in the dining area. Although Lemons told the police that there was no problem, Maradiaga testified that, in his experience, victims of domestic violence may lie to protect their partners. *See also United States v. Bartelho*, 71 F.3d 436, 442 (1st Cir. 1995). Finally, the officers' anxiety ripened into full-blown fear of violence when they spotted a loaded magazine for a semiautomatic weapon. As Maradiaga testified, his "first thought upon seeing [the] magazine" on the dining room table was that there was a weapon in the house that could be used against him or his partner. App. 195.

These events combined to generate a reasonable belief that the officers were faced with an exigency requiring immediate action to avoid serious injury or loss of life. The presence of the ammunition provided probable cause both to arrest Goree for unlawful possession of the magazine, and to believe that the firearm that the magazine fit was nearby.[6] That gun

---

[5] That fact alone is not enough, of course, to create an exception to the warrant requirement. *See Mincey*, 437 U.S. at 395 (rejecting a "murder scene exception" to the warrant requirement).

[6] *Cf. United States v. Brown*, 334 F.3d 1161, 1171 (D.C. Cir. 2003) (holding that "the presence of a gun" in a car's passenger compartment supported the possibility that the car's trunk "contained ammunition, additional weapons, and/or other contraband"); *United States v. Christian*, 187 F.3d 663, 669 (D.C. Cir. 1999) (noting that "the presence of one weapon may justifiably arouse concern that there may be more in the vicinity"); *United States v. Abdul–Saboor*, 85 F.3d 664, 670 (D.C. Cir. 1996) (holding that, having already uncovered two guns "and a magazine, the arresting officers could well anticipate that other weapons were stowed throughout

posed a serious danger to the police if Goree were to obtain it in an effort to resist arrest. The gun also posed a threat to Lemons if Goree were to obtain it in an effort to continue their reported domestic dispute. As the district court noted, such disputes: "are extremely volatile and unpredictable. And for police officers to conclude that they better find that gun lest the situation explode in some unpredicted fashion is not an unreasonable decision to make." App. 237. The fact that Goree was handcuffed reduced, but did not eliminate, the risk to the officers: although handcuffed, he was not immobilized. *Cf. United States v. Abdul–Saboor*, 85 F.3d 664, 670–71 (D.C. Cir. 1996) (sustaining warrantless search of a room in which the defendant had been arrested, notwithstanding that he was "handcuffed, sitting on a chair" four feet outside the room with two marshals, because the room was "conceivably accessible" to him).

Nor was Goree the only potential threat. It was also reasonable to fear that Lemons would try to use the gun to protect her boyfriend from the police. She was, as she later testified, hostile to the officers' presence. App. 138–40. Nor could the police be certain that, if Lemons obtained the gun, she would not use it to retaliate against Goree himself: the officers were told that a man had just dragged a woman into Apartment 204 by her hair. As described by the government, Lemons was not restrained during this period, but was moving "freely" about the apartment. Appellee's Br. at 28.

Finally, we must consider whether the search that the police conducted in response to these perceived threats was "limited in scope and proportionate to the exigency excusing the warrant requirement." *Socey*, 846 F.2d at 1448. As noted above, Goree does not dispute the officers' lawful presence in the dining room.[7] Hence, the only incursion at

the apartment, perhaps even within the area in which [the defendant] was seated").

[7] Nor does he dispute that a warrantless search of the dining area itself would have been justified as a search incident to arrest. Oral Arg. Tape at 4:05–6:15; *see Chimel v. California*, 395 U.S. 752 (1969); *Sealed Case*, 153 F.3d at 767–68. The government did not

issue is whatever further steps were required to put Officer Moon in a position to see the gun on top of the refrigerator. Indeed, because Goree also does not challenge the officers' first look into the kitchen for possible confederates, the only incremental incursion was Moon's second, wider look at that same space. The district court described the scope of that incursion as follows:

> The search for the gun took them to an adjacent room which was the kitchen and that is where the gun was discovered. The gun was not discovered under a mattress or behind a curtain. The gun was not discovered in a drawer or in a pocketbook. The gun was discovered out in plain view on top of a refrigerator.
>
> The person who discovered it was 6'–2". The refrigerator was shorter than that, and it is not unreasonable to conclude that *upon his entering the room and scanning it, the gun became immediately visible to him.*

App. 237 (emphasis added).

One inference from the court's statement that the gun became immediately visible "upon his entering the room" is that the only incursion that took place was Moon's crossing of a threshold separating the dining area from the kitchen. Such a step or two would certainly be limited and proportional to the exigency. As we have said, the presence of the ammunition clip provided probable cause to believe that a firearm was nearby. And it was reasonable for the officers to fear that Goree or Lemons could obtain that weapon if it were located just steps inside an "adjacent" room. *Id.* Crossing a threshold (or even opening a door, although no witness mentioned a door) would not have precluded either of them from grabbing the weapon.[8] Nor would the fact that Goree was

---

argue, however, that the search-incident-to-arrest exception extended to the kitchen.

[8] *Cf. Michigan v. Long*, 463 U.S. 1032, 1049 (1983) (upholding the search of a car, next to which the defendant had been standing at the time of a *Terry* stop, because of the possibility that he could enter the car and obtain a knife); *Christian*, 187 F.3d at 671 (same

handcuffed. *See Abdul–Saboor*, 85 F.3d at 670–71. Accordingly, on this inference from the district court's description, it would appear that the necessary exigent circumstances existed to justify the search that led to the discovery of the semiautomatic pistol.

Goree objects that such a conclusion is inconsistent with our decision in *United States v. Ford*, 56 F.3d 265 (D.C. Cir. 1995). In that case, the court held that the "protective sweep" exception of *Maryland v. Buie* authorized an FBI agent to look for possible confederates in a bedroom adjacent to the hallway in which he had arrested the defendant, and to seize an ammunition clip that he found there in plain view. *Ford*, 56 F.3d at 266. As Goree stresses, however, *Ford* further held that the "agent could not . . . lawfully search beyond that — neither under the mattress nor behind the window shades" — under either the protective sweep or the exigent circumstances exception. *Id.* For that reason, the court concluded that evidence seized from under the mattress and behind the shades was inadmissible at trial. *Id.*

On the government's view of the facts, Goree's case is quite different from Ford's. First, the nature of the exigency was more concerning. In *Ford*, the court stressed that "the crime which gave rise to Ford's arrest warrant occurred *months*, not minutes before the police arrived at his mother's apartment, and the seizures occurred *after*, not prior to or contemporaneous with Ford's arrest." 56 F.3d at 271. Here, by contrast, the police were responding to a crime (the domestic assault) in progress, and the officers' arrival, Goree's arrest, and the seizure all took place contemporaneously. While Ford "did not resist," *id.* at 267, Goree did. In *Ford* there were six officers present who "had secured all the persons in the apartment" before the search began. *Id.* at 271; *see id.* at 266. Here, there were only two officers on-scene at the start of the search.[9] Moreover, the government asserts that,

where the car door was closed and locked but the defendant had the key).

[9] Although the testimony was unclear as to whether two additional officers (the sergeants) arrived before or after the gun was found,

unlike the other persons in the *Ford* apartment, *id.* at 270, Lemons was not secured but rather was "moving freely about the apartment." Appellee's Br. at 28–29.

Second, the scope of the incursion was more intrusive in *Ford* than it was here. In *Ford*, the court objected neither to the agent's look into the adjacent bedroom, nor to the seizure of contraband that he found there in plain view, but rather to the agent's upending of the mattress and trolling beneath the shades. Here, by contrast, the district court found: "The gun was not discovered under a mattress or behind a curtain. The gun was not discovered in a drawer or in a pocketbook. The gun was discovered out in plain view on top of a refrigerator." App. 237. *See United States v. Lopez*, 989 F.2d 24, 25–27 (1st Cir. 1993) (upholding search in adjacent room because "the intrusion, although not minimal, was limited: the officer saw the opening in the bathroom ceiling through an open door, entered the empty room, and with little effort saw the butt of the weapon. There was no new entry into a private residence; the police were lawfully in the kitchen."). Indeed, to the extent that Officer Moon searched an area beyond that which Goree concedes was permissible, that search consisted of nothing more than a second look into a room that he had already lawfully swept once pursuant to *Buie*. In sum, on the facts that we have so far assumed, Officer Moon's search of the kitchen (and discovery of the gun) was permissible under the exigent circumstances exception to the Fourth Amendment's warrant requirement.

## IV

This brings us to the remaining question: do the facts support the scenario that we have just described and, as described, validated? Goree presses two points that give us some pause.[10]

there was no dispute that they had not arrived at the time the search began. *See* Appellant's Br. at 8; App. 102 (Maradiaga testimony); *id.* at 210, 212–13 (Sergeant Caldwell testimony).

[10] Goree also presents a number of additional factual claims that are readily dismissed. First, he challenges as clearly erroneous the

First, Goree disputes the extent of the claimed exigency, contending that there is no support for the government's assertion, Appellee's Br. at 28–29, that Lemons was "moving freely about the apartment" during the search, and thus that she posed a potential danger. The testimony upon which the government bases its assertion is at best inconclusive: Officer Maradiaga testified that Lemons was in the living room when the search began, App. 100, and Sergeant Caldwell testified that she was in the bedroom when he arrived, *id*. at 213. As Goree points out, there was no testimony as to how Lemons got from one place to the other and, particularly, whether the police themselves moved her. As Goree also correctly notes, the district court made no finding at all about Lemons' location during the course of the search, let alone as to whether she was "secured" or "moving freely about." Put simply, more facts relating to Lemons' situation are required in order to determine whether she posed a threat.

Second, Goree takes issue with the government's description of the scope of the intrusion. As we said above, one possible inference from the court's finding that the gun became immediately visible "upon [Officer Moon's] entering the room" is that the officer saw the weapon as soon as he

---

court's finding that the gun was "discovered in plain view on top of a refrigerator," App. 237, because Maradiaga merely testified that the gun was "located on top of the refrigerator," *id*. at 102. Goree contends that it is thus possible that the officer meant — although he did not say — that the gun was covered by something. While that may be possible, the court's inference that the officer meant that the gun was in plain sight is reasonable. Goree also disputes that anyone could have seen a gun high atop a refrigerator. But the court's explanation for finding the officer's testimony credible is again reasonable: Moon was four inches taller than the refrigerator. *Id*. at 236–37; *see id.* at 206. Finally, Goree further challenges Maradiaga's credibility by asking how, if the gun really was in plain sight, the police could have failed to see it the first time they looked in the room — during the *Buie* sweep for possible confederates. In context, however, the answer to that question is clear: unlike an officer searching for a gun, an officer looking for a person is not likely to focus on the top of a refrigerator.

took a step or two into the kitchen. But the court did not say that expressly, and neither did the testimony. All that Maradiaga said was that Moon found the gun "on top of the refrigerator," App. 102; Moon did not himself testify. Moreover, although there was evidence that the apartment was small and that the kitchen was "adjacent" to the dining room, there were no findings or testimony regarding the details of the apartment's layout: we do not know how far it was from the dining room table to the kitchen's threshold or how far it was from that threshold to the refrigerator. Nor do we know whether the path to either location was direct or obstructed. Nor — because we do not know how, or how well, Goree was secured — can we determine how readily he could have obtained a weapon located just a step or two into the kitchen.

In short, without further findings of fact on these issues, which may require taking additional testimony, the record is inadequate to establish whether sufficient potential danger remained, even after Goree's detention, to create an exigency justifying the warrantless search. In such circumstances, a remand for further proceedings is appropriate. *See United States v. Hutchinson*, 268 F.3d 1117, 1118 (D.C. Cir. 2001) (remanding because the district court failed to make "findings of fact essential to decide [the] legal issue" of whether a *Terry* stop was excessive); *United States v. Williams*, 951 F.2d 1287, 1291 (D.C. Cir. 1991) (remanding for factual findings supporting district court's denial of suppression motion); *see also* FED. R. CRIM. P. 12(d) (providing that "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record"); *Murray v. United States*, 487 U.S. 533, 543–44 (1988) (remanding for more explicit findings to resolve a suppression motion).[11]

---

[11] We further note that, if on remand the district court were to determine that the gun is inadmissible, it would then have to determine whether Goree's subsequent incriminating statements regarding the magazine and gun are inadmissible as well. That, in turn, would depend on whether Goree would have made those statements if his encounter with the police had ended with his concededly lawful arrest for possession of the magazine, but without the discovery of the gun. *See Wong Sun v. United States*, 371 U.S.

## V

For the foregoing reasons, the case is remanded for further proceedings consistent with this opinion.

---

471, 486–88 (1963); *James v. United States*, 418 F.2d 1150, 1151–52 (D.C. Cir. 1969). Both Goree and the government agree that a remand is required to resolve such factual issues.